IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HON. TOM PARKER, Associate Justice, Supreme Court of Alabama, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO. 2:16-CV-442-WKW ) [WO] |
| JUDICIAL INQUIRY COMMISSION OF THE STATE OF ALABAMA, *et al.*, | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This matter is before the court on Defendants' motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docs. # 12, 13.)

Plaintiff Tom Parker, an Associate Justice of the Alabama Supreme Court ("Plaintiff" or "Justice Parker"), filed a Verified Complaint for Declaratory Judgment and Injunctive Relief on June 15, 2016. (Doc. # 1.) Brought under 42 U.S.C. § 1983, this action challenges the constitutionality of Alabama Canons of Judicial Ethics ("Judicial Canons") 1, 2A, and 3A(6), as well as Section 159 of the Alabama Constitution. Justice Parker argues that the Judicial Canons violate his First Amendment free speech rights and that Section 159 violates his Fourteenth Amendment due process rights. Consequently, he asks the court to declare each

unconstitutional, to enjoin their enforcement, and to award him costs and attorney's fees.

Defendants, the Judicial Inquiry Commission of the State of Alabama and its members named in their official capacities (collectively, the "JIC"), have moved for dismissal on the ground that *Younger v. Harris*, 401 U.S. 37 (1971), requires the court to abstain from hearing the case. (Doc. # 12.) The JIC raises this argument under Rules 12(b)(1) and 12(b)(6), but submits that Rule 12(b)(1) is the proper vehicle by which to raise *Younger*. The Attorney General of Alabama, also a defendant, has incorporated this argument in a separate motion to dismiss. (Doc. # 13.) For reasons to be discussed, both motions to dismiss are due to be granted, and this action is due to be dismissed under Rule 12(b)(1) based on *Younger* abstention.[1]

## II. JURISDICTION AND VENUE

The complaint predicates subject-matter jurisdiction on 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

---

[1] Whether *Younger* abstention should be raised under Rule 12(b)(1) or 12(b)(6) is the subject of some dispute. Some courts have emphasized that *Younger* "reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses," thus making 12(b)(1) seem an inappropriate vehicle. *Weekly v. Morrow*, 204 F.3d 613, 615 (5th Cir. 2000) (quoting *Benavidez v. Eu*, 34 F.3d 825, 829 (9th Cir. 1994)). *See also New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358–59 (1989). This insight notwithstanding, other courts often allow *Younger* abstention arguments to be "raised through a Rule 12(b)(1) motion." 5B Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure*, § 1350 at 96–100. This district is no exception. *See, e.g., Moore v. JIC*, No. 2:16-cv-388-WHA, 2016 WL 4157328, at *1 (M.D. Ala. Aug. 4, 2016) ("The court has considered the Defendants' *Younger* abstention argument to be appropriately raised under Rule 12(b)(1)."). The court follows *Moore* but notes that the final result of this litigation in no way depends on whether this case is dismissed under 12(b)(1) or 12(b)(6).

### III.  STANDARD OF REVIEW

A 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction may take the form of a facial or factual attack.  *McElmurray v. Consol. Gov't of Augusta-Richmond City*, 501 F.3d 1244, 1251 (11th Cir. 2007).  A facial attack requires the court to determine whether the pleadings, on their face, allege a sufficient basis for subject-matter jurisdiction.  *Id.*  In analyzing a facial attack, the court assumes all well-pleaded allegations in the plaintiff's complaint are true.  *Id.*  A factual attack, by contrast, challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).  The motions at issue here attack the court's jurisdiction both facially and factually.  (Docs. # 12, 13.)

### IV.  BACKGROUND

On March 3, 2015, prior to the United States Supreme Court's decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the Alabama Supreme Court held that the Alabama Sanctity of Marriage Amendment and the Alabama Marriage Protection Act, which defined marriage as the union of one man and one woman, did not run afoul of the federal Constitution.  *Ex parte State v. King*, No. 1140460,

3

—— So. 3d ——, 2015 WL 892752 (Ala. 2015).  Later that year, on June 26, 2015, the U.S. Supreme Court decided *Obergefell*.[2]

On October 6, 2015, Justice Parker, who is a candidate for reelection to the Alabama Supreme Court, appeared on a radio talk show during which he was asked, among other things, about his personal views on federalism, the U.S. Supreme Court, and the *Obergefell* decision.  Specifically, Justice Parker expressed his opinion that Wisconsin's response over 150 years ago to the U.S. Supreme Court's pro-slavery decisions, *e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393 (1857), provides precedent for states to ignore federal rulings they believe are in conflict with the U.S. Constitution.[3]  His comments are contextualized and laid out in detail below.

---

[2] In *Obergefell*, 135 S. Ct. at 2599, the U.S. Supreme Court held that marriage laws in Michigan, Kentucky, Ohio, and Tennessee, which were similar to the Alabama law, were unconstitutional.

[3] The *Dred Scott* case infamously held that a slave was an "article of property," not a rights-bearing citizen, and thus could not sue for his freedom.  60 U.S. at 408.  Relatedly, the Wisconsin Supreme Court famously refused to enforce a U.S. Supreme Court decision holding that the Fugitive Slave Act (which required northern states to return runaway slaves to their masters) was constitutional.  The explanation provided on the Wisconsin Court System website is most helpful:

> What has become known as the *Booth* case is actually a series of decisions from the Wisconsin Supreme Court beginning in 1854 and one from the U.S. Supreme Court, *Ableman v. Booth*, 62 U.S. 514 (1859), leading to a final published decision by the Wisconsin Supreme Court in *Ableman v. Booth*, 11 Wis. 501 (1859).  These decisions reflect Wisconsin's attempted nullification of the federal fugitive slave law, the expansion of the state's rights movement and Wisconsin's defiance of federal judicial authority.  The Wisconsin Supreme Court in Booth unanimously declared the Fugitive Slave Act (which required northern states to return runaway slaves to their masters) unconstitutional.  The U.S. Supreme Court overturned that decision but the Wisconsin Supreme Court refused to file the U.S. Court's mandate upholding the fugitive slave law.  That mandate has never been filed.

>When asked about Wisconsin, Justice Parker said:
>
>The Wisconsin situation in fact involved a double defiance of the Supreme Court. First they defied the *Dred Scott* decision, and then their decision in defiance was taken up to the U.S. Supreme Court, which reversed it, sent its mandate back to the Wisconsin Supreme Court, which refused to accept that mandate, so the reversal was never acted on.
>
>I think it was a model of what we need to see in this [country]. Now, in the federalist papers, they said the states should be a restriction on the powers of the federal government to prevent it from overreaching.
>
>. . . [I]t's time for the state Supreme Courts to rise up and do their responsibility for this entire system we have nationally, otherwise it's just going to continue to get worse and worse.

(Doc. # 1-1, at 11). Having raised Wisconsin as an example, the radio host began to get more specific. He asked, "What is the lay of the land right now in Alabama with regard to the subject of same sex marriage?" (Doc. # 1-1, at 12.) Justice Parker, in response, laid out the history of *King* and *Obergefell*, and noted that, because "nobody appealed [*King*] to the U.S. Supreme Court," the Alabama Supreme Court must now determine whether *King* remains enforceable in Alabama. (Doc. # 1-1, at 12.) He explained that, in his view, the *Obergefell* mandate extends only "to the one court of appeals that was the source of the original cases taken to the U.S. Supreme Court" because Article III of the U.S. Constitution "says that the [Court's]

---

*In Re: Booth*, *Famous cases of the Supreme Court*, Wisconsin Court System, https://www.wicourts.gov/courts/supreme/docs/famouscases01.pdf. The same document can also be found in the record. (Doc. 26-1.)

jurisdiction is over cases or controvers[ies], and the practice from the very beginning was that a decision by the U.S. Supreme Court only affected the parties before that court." (Doc. # 1-1, at 13.)

Justice Parker made it very clear he does not agree with the reasoning of *Obergefell*. Far from it, he believes the decision runs "contrary to the constitution" and is out of step with popular opinion. (Doc. # 1-1, at 15.) Unpopular judicial decrees, he thinks, are due largely to the fact that federal judges are appointed for life rather than being elected by the people they represent. (Doc. #1-1, at 14–15.) Lifetime appointments make judges unaccountable to the people, while elections help to "keep judges in line." (Doc. # 1-1, at 15.)

The subject of judicial accountability prompted a broader dialogue about federalism, especially as it relates to *Obergefell*. Justice Parker explained to the audience that the Tenth Amendment "says that the state retains rights not delegated to the federal government" and "[t]here is nothing in the constitution that delegates any rights over marriage to the federal government." (Doc. # 1-1, at 16.) He argued that the *Obergefell* decision was an example of the federal government "intruding into the state prerogative" in violation of the Tenth Amendment, and he voiced his belief that "states should be a check on the federal government." (Doc. # 1-1, at 16, 17.) Asked what would happen if a state Supreme Court refused to "accept the jurisdiction of the [U.S.] Supreme Court," Justice Parker said:

> I doubt that it would be a blanket defiance of all jurisdiction of the U.S. Supreme Court, but in regard to the *Obergefell* decision, where it's clear that they jumped outside of all the precedents in order to impose their will on this country, that yes, resisting that decision could maybe state a revival of what we need in this country to return to our original founding principles.

(Doc. # 1-1, at 9.).

In summary, Justice Parker—a candidate for political office, nearing election season, and speaking in a public forum—expressed his personal views on a number of highly contentious legal and political issues that his constituents, and the country at large, are currently facing.

The Southern Poverty Law Center ("SPLC") took offense.  On October 12, 2015, the SPLC filed a complaint with the JIC—the body charged with investigating violations of Judicial Canons and the primary defendant in this lawsuit.  The complaint alleged that Justice Parker's comments "assault the authority and integrity of the federal judiciary" and "publicly endorse . . . [defiance of] *Obergefell*."  SPLC further complained that Justice Parker "offers ridicule and suggests defiance," which in turn "foments the false impression in the public's mind that the federal judiciary has tyrannically taken for itself unconstitutional power . . . ."  Thus, said the SPLC, Justice Parker's expression of criticism of the federal courts in general, and the U.S. Supreme Court in particular, is worthy of state-sanctioned disciplinary action because it violated of a host of Judicial Canons promulgated by the state of Alabama.

Specifically, the complaint alleges that Justice Parker's comments were in violation of Canon 1, which requires a judge to observe "high standards of conduct so that the integrity . . . of the judiciary may be preserved"; Canon 2(A), which requires a judge to "conduct himself at all times in a manner that promotes public confidence in the integrity . . . of the judiciary"; and Canon 3(A)(6), which requires a judge to "abstain from public comment about a pending or impending proceeding in any court."[4]  (Doc. # 1-1.)

On November 5, 2015, the JIC notified Justice Parker that it intended to investigate all three purported violations, and informed him of his right to respond. (Doc. # 1-3.)  Justice Parker responded on January 4, 2016.  (Doc. # 26-1.)  Since then, the JIC has kept its investigation open but has not filed a formal complaint with the Court of the Judiciary ("COJ"), which is the body responsible for trying ethics complaints after formal charges are filed.  COJ decisions are appealable to the Alabama Supreme Court.  Ala. Const., art. VI, § 157(b).  Justice Parker filed this lawsuit in federal court on June 15, 2016.  (Doc. # 1.)

## V. DISCUSSION

While acknowledging the First Amendment issues that arise when the SPLC, in a political season, attempts to use an agency of state government to suppress

---

[4] The other statutory provision challenged by Justice Parker is Section 159 of the Alabama Constitution, which disqualifies him from acting as a judge while there is a pending JIC complaint. Ala. Const., art. VI, § 159.

speech with which the SPLC disagrees, the court also recognizes its duty to resolve legal questions in order of their priority. Thus, the threshold issue before the court today is whether the court must decline to exercise jurisdiction under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). In *Younger*, the Supreme Court held that "the possible unconstitutionality of a [state] statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it." *Id.* at 54. This "longstanding public policy against federal court interference with state court proceedings" reflects "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 43–44. The federal government, "anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* at 44. Therefore, if *Younger* compels abstention, the court will not reach the underlying First Amendment issue.

Although *Younger* itself involved the state prosecution of a criminal defendant, the Supreme Court has since extended *Younger* to also apply to "civil enforcement proceedings" and civil proceedings "that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Pub. Serv.,*

*Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*"). *Younger* abstention is thus appropriate in only three circumstances: (1) criminal prosecutions; (2) civil enforcement proceedings; and (3) civil proceedings that promote the state's ability to perform its judicial functions. *Id*. When such cases arise, courts determine whether to abstain by considering the *Middlesex* factors: "*first*, do [the proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). However, satisfaction of the *Middlesex* factors, by itself, is not sufficient to justify *Younger* abstention. *See Sprint Commc'ns v. Jacobs*, 134 S. Ct. 584, 593 (2013) (clarifying that the "*Middlesex* conditions . . . were not dispositive"). The factors are applied only after a determination that the case falls into one of the categories enunciated by the court in *NOPSI*. *Id*. at 594 ("*Younger* extends to the three 'exceptional circumstances' identified in *NOPSI*, but no further.").

Because the regulation of judicial ethics is unquestionably in furtherance of Alabama's ability to perform its judicial functions, it is appropriate to consider the three *Middlesex* factors. *NOPSI*, 491 U.S. at 368. The court will analyze each factor but will do so out of order, leaving the first (and, in this case, the most difficult) factor for last.

10

### A. Important State Interest

Justice Parker does not dispute that Alabama has an important interest in regulating the conduct of state judges. Indeed, the Supreme Court "repeatedly has recognized that the States have important interests in administering certain aspects of their judicial systems." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12–13 (1987). He does, however, contend that this court should decline to abstain because the state proceedings in which he finds himself are not "quasi-criminal" in nature, and thus not susceptible to *Younger*.

This argument misses the mark. "[W]hether the proceeding is labeled civil, quasi-criminal, or criminal in nature, the salient fact is whether federal-court interference would unduly interfere with the legitimate activities of the state." *Middlesex*, 457 U.S. at 433 n.12 (citation and quotation marks omitted). The ethical conduct of state court judges being integral to the administration of any state judicial system, the court finds that enjoining the enforcement of state judicial ethics canons would unduly interfere with legitimate state activities. Thus, the second prong is satisfied.

### B. Adequate Opportunity to Raise Constitutional Challenges

"Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex*, 457 U.S. at 431. Accordingly, the burden of proof is placed on the party

11

claiming the state proceeding is inadequate. *Pennzoil Co.*, 481 U.S. at 14. Here, Justice Parker complains that the JIC cannot give him the remedies he desires, but he never denies his ability to raise his federal constitutional claims in the JIC forum. (Doc. # 34, at 14–18.) Indeed, the JIC provided a copy of the Justice's response, complete with his signature, which raises the very same constitutional claims he has raised in this court. (Doc. # 26-1, at 6–23.) As the Supreme Court has made clear, the "pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims." *Middlesex*, 457 U.S. at 432 (quoting *Moore v. Sims*, 442 U.S. 415, 426 (1979)). It appears Justice Parker has had such an opportunity here.[5]

If the court's independent judgment were not enough, the Eleventh Circuit has suggested the same conclusion, albeit with some uncertainty. In *Butler v. Alabama Judicial Inquiry Commission*, 245 F.3d 1257 (11th Cir. 2001) ("*Butler I*"), this circuit certified several questions to the Alabama Supreme Court in an almost identical case involving charges against a justice of the Alabama Supreme Court in an election season. One of the questions asked whether a defendant may "raise and have decided a constitutional challenge to a judicial canon" in the same type of JIC

---

[5] The argument that the JIC would not consider the federal Constitution in its decision, despite constitutional issues being raised, is likewise destined for failure. As the Supreme Court said in regard to a similar argument, "it would seem an unusual doctrine . . . to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986).

and COJ proceedings at issue in this case. *Id.* at 1265. The only Justice to directly answer the question indicated that constitutional objections *could* be raised and decided in such proceedings. *Butler v. Ala. Judicial Inquiry Comm'n*, 261 F.3d 1154, 1159 (11th Cir. 2001) ("*Butler II*"). Consequently, while recognizing the lack of "authoritative guidance," the Eleventh Circuit concluded that "an adequate state forum likely exists." *Id.* The facts of this case only serve to further corroborate that judgment. Thus, the third *Middlesex* prong is satisfied.

C. **Ongoing State Judicial Proceeding**

Justice Parker's best argument against *Younger* abstention is that the investigation being conducted by the JIC is not an ongoing judicial proceeding. To support this contention, Justice Parker points out that no official complaint has been filed with the COJ and cites a number of authorities suggesting that *investigatory* proceedings, in the absence of formal *judicial* proceedings, are insufficient to trigger *Younger*. (Doc. # 34, at 7.) However, upon closer examination, each of the authorities relied upon is either distinguishable or inapplicable to this case.

For example, Justice Parker relies on *Sprint Communications v. Jacobs*, 134 S. Ct. 584, 592 (2013), for the proposition that "preliminary investigations without the commencement of formal judicial proceedings fail to constitute state judicial proceedings sufficient to invoke *Younger* abstention." (Doc. # 34, at 7.) He is correct that *Jacobs* involved an investigation rather than a formal proceeding, and

13

that the court declined to apply *Younger*. But he is wrong to suggest that the proceeding's investigatory nature is what made the court decide to hear the case. The court in *Jacobs* declined to apply *Younger* because the investigation at issue did not fall into one of the three exceptions set forth in *NOPSI*. *Jacobs*, 134 S. Ct. at 593–94 ("*Younger* extends to the three 'exceptional circumstances' identified in *NOPSI*, but no further."). Because this case involves state interests that are "uniquely in furtherance of the state courts' ability to perform their judicial functions"—*i.e.*, because it involves one of the "exceptional circumstances" enunciated in *NOPSI*—the reasoning of *Jacobs* does not apply.

Nor can the JIC proceedings at issue here fairly be analogized to a criminal prosecution that "has been threatened, but is not pending." *See Steffel v. Thompson*, 415 U.S. 452, 454 (1974). In the criminal context, the Supreme Court has said that *threatened* criminal prosecutions are not sufficient to justify abstention under *Younger*. *Id.* Justice Parker argues that the JIC investigation, without the filing of a formal complaint with the COJ, is like a threatened prosecution. (Doc. # 34 at 8.) In the court's view, the JIC investigation is more like a grand jury proceeding.

The Alabama Appellate Courts website explains that the JIC, which is a body created by the state constitution, *see* Ala. Const., art. VI, § 156, is "charged with investigating complaints of misconduct or professional wrongdoing on the part of

14

judges."[6] The commission consists of nine members, three of whom are not lawyers, who are appointed by various state officials.[7] If five or more members of the commission, after investigation, find "a reasonable basis exists to charge a judge with a violation," then the JIC "is authorized to file a complaint with the Court of the Judiciary." The website summarizes the role of the commission as one "*similar to that of a grand jury*." Consistent with the U.S. Supreme Court's practice in previous cases, this court is inclined to defer to the state's own description of its proceedings and treat the JIC like a grand jury. *See, e.g., Middlesex*, 457 U.S. at 432–34.

However, likening the JIC procedure to that of a grand jury does not resolve the issue. On the question of whether a grand jury proceeding constitutes an ongoing state judicial proceeding of the kind required to invoke *Younger*, the circuits are split. *Texas Ass'n of Business v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004) (noting the circuit split). The Eleventh Circuit has yet to decide the issue, but of the four circuits that have, three have held that a grand jury proceeding constitutes an ongoing judicial proceeding under *Younger*. *Id.* at 520–21; *Craig v. Barney*, 678 F.2d 1200

---

[6] http://judicial.alabama.gov/appl_canons.cfm, last visited Sept. 12, 2016.

[7] Of the commission's membership, the website says the following: "The commission is composed of an appellate judge appointed by the supreme court (cannot be a supreme court justice); two circuit judges appointed by the Circuit Judges' Association; one District Judge appointed by the Lt. Governor; three persons who are non-lawyers appointed by the governor with confirmation by the Senate; and two members of the State Bar appointed by the Board of Bar Commissioners."

(4th Cir. 1982); *Kaylor v. Fields*, 661 F.2d 1177 (8th Cir. 1981). *But see Monaghan v. Deakins*, 798 F.2d 632 (3rd Cir. 1986) (holding that a grand jury proceeding is not ongoing), *aff'd in part, vacated in part on other grounds*, 484 U.S. 193 (1998).[8]

Assuming without deciding that the JIC proceedings are analogous to grand jury proceedings, the court finds these authorities persuasive. However, this court need not rely on the majority view of the above circuit split. Indeed, the consensus view of a series of nonbinding cases that are analogous, but admittedly not identical, to this case would give the court more pause if it were not for several other factors weighing in favor of applying *Younger* here. There are at least three additional reasons that weigh in favor of abstaining rather than hearing this case.

First, perhaps the most convincing of these reasons is the fact that the Supreme Court has held previously that the prerequisites for *Younger* were satisfied at an identical stage of a similar proceeding in New Jersey. In *Middlesex*, the U.S. Supreme Court held that a state disciplinary proceeding—which was administered by the New Jersey state bar and, much like the proceeding here, designed to discipline lawyers who had committed ethics violations—was "ongoing" as soon as the initial complaint was filed. 457 U.S. at 433. *Middlesex* was perhaps an easier

---

[8] District courts facing the same question overwhelmingly have reached the consensus view that a grand jury proceeding is sufficient to satisfy *Younger*. *See, e.g., Doe v. The Order Desk, Inc.*, No. CIV.A.3:97-CV-1479, 1997 WL 405141, at *7 (N.D. Tex. July 14, 1997); *Law Firm of Daniel P. Foster, P.C., v. Dearie*, 613 F. Supp. 278, 280 (E.D.N.Y. 1985); *Notey v. Hynes*, 418 F. Supp. 1320, 1326 (E.D.N.Y. 1976).

16

case than what the court faces today because the New Jersey Supreme Court had made very clear that the proceeding was "judicial in nature" from the outset.[9]  *Id.*  However, as the U.S. Supreme Court clarified in a subsequent case, a key factor weighing into its decision in *Middlesex* was the fact that the adjudication of the ethics committee was ultimately appealable to the state supreme court.  *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986) ("[W]e have held that federal courts should refrain from enjoining lawyer disciplinary proceedings initiated by state ethics committees *if the proceedings are within the appellate jurisdiction of the appropriate State Supreme Court*.") (emphasis added).  The same is true of the JIC proceeding at issue here.  Ala. Const., art. VI, § 157(b).  This holding weighs in favor of applying *Younger*.

Second, even supposing the JIC proceedings were administrative rather than "judicial in nature," application of the *Younger* doctrine is appropriate.  The Supreme Court has readily applied *Younger* "to state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim."  *Dayton*, 477 U.S. at 627.  As Parts V.A and V.B already have demonstrated, the JIC proceedings are designed to vindicate an important state

---

[9] Because *Younger* requires that there be a proceeding that is both "ongoing" and "judicial," the court in *Middlesex* faced a simpler task in that half the work was already done for it.

interest and do in fact provide an adequate opportunity to litigate constitutional claims. This favors abstention.

Third, as the JIC points out in its briefing (Doc. # 36, at 3–4), the circuits uniformly have treated state administrative proceedings as "unitary" in determining whether they are "ongoing" (or "pending") for *Younger* purposes. *See Hudson v. Campbell*, 663 F.3d 985, 988 (8th Cir. 2011); *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 167 (4th Cir. 2008); *Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 35 (1st Cir. 2004); *Majors v. Engelbrecht*, 149 F.3d 709, 713 (7th Cir. 1998); *O'Neill v. City of Phila.*, 32 F.3d 785, 791 (3rd Cir. 1994). *See also M.R. v. Bd. of Sch. Comm'rs of Mobile Cty.*, No. 11-0245-WS-C, 2012 WL 3778283, at *3 (S.D. Ala. Aug. 30, 2012) (citing the above cases and discussing the "unitary proceeding" rationale in depth). All five circuits that have ruled on the issue have agreed that, to use the language employed by the First Circuit, "*Younger* now has to be read as treating the state process . . . as a continuum from start to finish," which at any point precludes the "right to detour into federal court." *Maymo-Melendez*, 364 F.3d at 35. Under this understanding, state proceedings, whether judicial or administrative, are considered "ongoing" from the very beginning of the process until the end, as long as the final decision is reviewable by the state court system. The state process has clearly begun here. Thus, even if the JIC proceeding is administrative, *Younger* likely applies.

18

## VI.  CONCLUSION

In the absence of binding Eleventh Circuit or Supreme Court authority, this court heeds the reasoned opinions of its colleagues in other circuits.  Whether the JIC proceeding is more appropriately characterized as a grand jury or administrative proceeding, the relevant authorities suggest that it is "ongoing" for purposes of *Younger*.  Therefore, in accordance with the longstanding principle of comity and out of respect for federalism, the court concludes that *Younger* is applicable here and abstains from exercising jurisdiction.

Alternatively, if there be any doubt about the prudence of today's decision, the Eleventh Circuit instructs courts to "err—if we err at all—on the side of abstaining."  *Butler II*, 261 F.3d at 1159.  To the extent that the question today is unclear, abstention is appropriate.

It is ORDERED that Defendants' motions to dismiss (Docs. # 12, 13) are GRANTED.  A final judgment will be entered separately.

DONE this 29th day of September, 2016.

                                       /s/ W. Keith Watkins
                          CHIEF UNITED STATES DISTRICT JUDGE