IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HON. TOM PARKER, Associate Justice, Supreme Court of Alabama, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO. 2:16-CV-442-WKW [WO] |
| JUDICIAL INQUIRY COMMISSION OF THE STATE OF ALABAMA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION & BACKGROUND

On March 3, 2015, prior to the United States Supreme Court's decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the Alabama Supreme Court held that the Alabama Sanctity of Marriage Amendment and the Alabama Marriage Protection Act, which defined marriage as the union of one man and one woman, did not run afoul of the federal Constitution. *Ex parte State v. King*, No. 1140460, —— So. 3d ——, 2015 WL 892752 (Ala. 2015). Later that year, on June 26, 2015, the U.S. Supreme Court decided *Obergefell*.[1]

---

[1] In *Obergefell*, 135 S. Ct. at 2599, the U.S. Supreme Court held that marriage laws in Michigan, Kentucky, Ohio, and Tennessee, which were similar to the Alabama law, were unconstitutional.

On October 6, 2015, Justice Parker, who was a candidate for reelection to the Alabama Supreme Court[2], appeared on a radio talk show during which he was asked, among other things, about his personal views on federalism, the U.S. Supreme Court, and the *Obergefell* decision. Specifically, Justice Parker expressed his opinion that Wisconsin's response over 150 years ago to the U.S. Supreme Court's pro-slavery decisions, *e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393 (1857), provides precedent for states to ignore federal rulings they believe are in conflict with the U.S. Constitution.[3] His comments are contextualized and laid out in detail below.

---

[2] Justice Parker was a candidate for reelection to the Alabama Supreme Court at the time this lawsuit was filed. He has also expressed interest in running for the position of Chief Justice in the future (*See* Doc. # 59-1, at 2), which is relevant to the mootness question discussed later because the challenged judicial canons could affect speech interests during his future candidacy.

[3] The *Dred Scott* case infamously held that a slave was an "article of property," not a rights-bearing citizen, and thus could not sue for his freedom. 60 U.S. at 408. Relatedly, the Wisconsin Supreme Court famously refused to enforce a U.S. Supreme Court decision holding that the Fugitive Slave Act (which required northern states to return runaway slaves to their masters) was constitutional. The explanation provided on the Wisconsin Court System website is most helpful:

> What has become known as the *Booth* case is actually a series of decisions from the Wisconsin Supreme Court beginning in 1854 and one from the U.S. Supreme Court, *Ableman v. Booth*, 62 U.S. 514 (1859), leading to a final published decision by the Wisconsin Supreme Court in *Ableman v. Booth*, 11 Wis. 501 (1859). These decisions reflect Wisconsin's attempted nullification of the federal fugitive slave law, the expansion of the state's rights movement and Wisconsin's defiance of federal judicial authority. The Wisconsin Supreme Court in Booth unanimously declared the Fugitive Slave Act (which required northern states to return runaway slaves to their masters) unconstitutional. The U.S. Supreme Court overturned that decision but the Wisconsin Supreme Court refused to file the U.S. Court's mandate upholding the fugitive slave law. That mandate has never been filed.

*In Re: Booth*, *Famous Cases of the Supreme Court*, Wisconsin Court System, https://www.wicourts.gov/courts/supreme/docs/famouscases01.pdf. The same document can also be found in the record. (Doc. # 26-1.)

When asked about Wisconsin, Justice Parker said:

> The Wisconsin situation in fact involved a double defiance of the Supreme Court. First they defied the *Dred Scott* decision, and then their decision in defiance was taken up to the U.S. Supreme Court, which reversed it, sent its mandate back to the Wisconsin Supreme Court, which refused to accept that mandate, so the reversal was never acted on.
>
> I think it was a model of what we need to see in this [country]. Now, in the federalist papers, they said the states should be a restriction on the powers of the federal government to prevent it from overreaching.
>
> . . . [I]t's time for the state Supreme Courts to rise up and do their responsibility for this entire system we have nationally, otherwise it's just going to continue to get worse and worse.

(Doc. # 1-1, at 11). Having raised Wisconsin as an example, the radio host began to get more specific. He asked, "What is the lay of the land right now in Alabama with regard to the subject of same sex marriage?" (Doc. # 1-1, at 12.) Justice Parker, in response, laid out the history of *King* and *Obergefell*, and noted that, because "nobody appealed [*King*] to the U.S. Supreme Court," the Alabama Supreme Court must now determine whether *King* remains enforceable in Alabama. (Doc. # 1-1, at 12.) He explained that, in his view, the *Obergefell* mandate extends only "to the one court of appeals that was the source of the original cases taken to the U.S. Supreme Court" because Article III of the U.S. Constitution "says that the [Court's] jurisdiction is over cases or controvers[ies], and the practice from the very beginning was that a decision by the U.S. Supreme Court only affected the parties before that court." (Doc. # 1-1, at 13.)

3

Justice Parker made it clear he does not agree with the reasoning of *Obergefell*. Far from it, he believes the decision runs "contrary to the constitution" and is out of step with popular opinion. (Doc. # 1-1, at 15.) Unpopular judicial decrees, he thinks, are due largely to the fact that federal judges are appointed for life rather than being elected by the people they represent. (Doc. #1-1, at 14–15.) Lifetime appointments make judges unaccountable to the people, while elections help to "keep judges in line." (Doc. # 1-1, at 15.)

The subject of judicial accountability prompted a broader dialogue about federalism, especially as it relates to *Obergefell*. Justice Parker explained to the audience that the Tenth Amendment "says that the state retains rights not delegated to the federal government" and "[t]here is nothing in the constitution that delegates any rights over marriage to the federal government." (Doc. # 1-1, at 16.) He argued that the *Obergefell* decision was an example of the federal government "intruding into the state prerogative" in violation of the Tenth Amendment, and he voiced his belief that "states should be a check on the federal government." (Doc. # 1-1, at 16, 17.) Asked what would happen if a state Supreme Court refused to "accept the jurisdiction of the [U.S.] Supreme Court," Justice Parker said:

> I doubt that it would be a blanket defiance of all jurisdiction of the U.S.
> Supreme Court, but in regard to the *Obergefell* decision, where it's clear
> that they jumped outside of all the precedents in order to impose their
> will on this country, that yes, resisting that decision could maybe state
> a revival of what we need in this country to return to our original
> founding principles.

(Doc. # 1-1, at 9.).

In summary, Justice Parker—a candidate for political office, nearing election season, and speaking in a public forum—expressed his personal views on a number of highly contentious legal and political issues that his constituents, and the country at large, are currently debating

The Southern Poverty Law Center ("SPLC") took offense. On October 12, 2015, the SPLC filed a complaint with the JIC—the body charged with investigating violations of Judicial Canons and the primary defendant in this lawsuit. The complaint alleged that Justice Parker's comments "assault the authority and integrity of the federal judiciary" and "publicly endorse . . . [defiance of] *Obergefell*." SPLC further complained that Justice Parker "offers ridicule and suggests defiance," which in turn "foments the false impression in the public's mind that the federal judiciary has tyrannically taken for itself unconstitutional power . . . ." Thus, said the SPLC, Justice Parker's expression of criticism of the federal courts in general, and the U.S. Supreme Court in particular, is worthy of state-sanctioned disciplinary action because it violated a host of Judicial Canons promulgated by the state of Alabama.

Specifically, the complaint alleges that Justice Parker's comments were in violation of Canon 1, which requires a judge to observe "high standards of conduct so that the integrity . . . of the judiciary may be preserved"; Canon 2(A), which requires a judge to "conduct himself at all times in a manner that promotes public

confidence in the integrity . . . of the judiciary"; and Canon 3(A)(6), which requires a judge to "abstain from public comment about a pending or impending proceeding in any court."[4] (Doc. # 1-1.)

On November 5, 2015, the JIC notified Justice Parker that it intended to investigate all three purported violations, and informed him of his right to respond. (Doc. # 1-3.) Justice Parker responded on January 4, 2016. (Doc. # 26-1.) Since then, the JIC has kept its investigation open but has not filed a formal complaint with the Court of the Judiciary ("COJ"), which is the body responsible for trying ethics complaints after formal charges are filed. COJ decisions are appealable to the Alabama Supreme Court. Ala. Const., art. VI, § 157(b). Justice Parker filed this lawsuit in federal court on June 15, 2016. (Doc. # 1.)

On July 14, 2016, Defendants moved for dismissal on the ground that *Younger v. Harris*, 401 U.S. 37 (1971), required the court to abstain from hearing the case. (Doc. # 12.) Earlier in this case, the court recognized "the First Amendment issues" implicated by SPLC's attempt to use a state agency to suppress speech (Doc. # 39, at 8–9), but it nevertheless held that the JIC investigation constituted an "ongoing" state proceeding under *Younger*, which precluded federal court intervention (Doc. #

---

[4] The other statutory provision challenged by Justice Parker is Section 159 of the Alabama Constitution, which disqualifies him from acting as a judge while there is a pending JIC complaint. Ala. Const., art. VI, § 159.

39, at 19).  Thus, on that ground Defendants' first pair of Motions to Dismiss (Docs. # 12, 13) were granted.

Justice Parker appealed, only to have JIC drop the investigation while the appeal was pending.  With *Younger* no longer an issue, the Eleventh Circuit remanded the case "to consider the issue of mootness, in addition to any other arguments concerning jurisdiction and the merits of the complaint."  (Doc. # 49, at 2.)  This court then ordered the parties to file briefs "setting forth their position on whether this case should be dismissed as moot or otherwise for lack of jurisdiction." (Doc. # 50.)  In response, JIC filed a new Motion to Dismiss (Doc. # 51), asserting that Justice Parker's claims are moot and that, in any event, he cannot state a claim for relief.  The Attorney General renewed his original Motion to Dismiss (Doc. # 53 (incorporating arguments contained in Doc. # 13)), concurring with JIC's mootness argument and adding two arguments of his own: (1) that Justice Parker lacks standing to sue the Attorney General, and (2) that the Attorney General enjoys Eleventh Amendment sovereign immunity.  For the reasons set forth below, Defendants' Motions to Dismiss are due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

### III.  STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Even though the court assumes the facts alleged in a complaint are true, it does not accept "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action."  *Id*.  A plaintiff's claim is "plausible" only if it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.

### IV.  DISCUSSION

Justice Parker's claims challenge the constitutionality of several Alabama Canons of Judicial Ethics ("Judicial Canons"), as well as Section 159 of the Alabama Constitution, both facially and as-applied.  He argues that the Judicial Canons violate the First Amendment right to freedom of speech by restricting the ability of judges to speak out on certain issues, and that Section 159 violates the Fourteenth Amendment right to due process by suspending judges who have JIC complaints pending against them.

The issues are fourfold: (1) whether Justice Parker has standing to sue JIC and the Attorney General; (2) whether the Attorney General may escape this litigation by asserting sovereign immunity; (3) whether Justice Parker has stated a claim for relief under the Due Process Clause; and (4) whether Justice Parker's claims under the First Amendment and Due Process Clause are moot. Each question will be answered in turn.

## A.  **Standing**

### 1.  *Justice Parker has standing to bring a preenforcement challenge under the First Amendment and Due Process Clause.*

Standing ordinarily requires that a plaintiff show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, because Justice Parker seeks to challenge the law before it has been enforced against him, the issue is whether he can satisfy the injury-in-fact requirement. "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The Supreme Court has said that "a [preenforcement] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution

thereunder.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). And, in the First Amendment context, litigants may even challenge a statute based on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (quoting *Sec'y of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 956–57 (1984)).

Justice Parker has alleged that he intends to engage in political speech that is arguably proscribed by the Judicial Canons at issue and might result in his automatic suspension under § 159.[5] (*See, e.g.,* Doc. #1, at 19 (alleging that the Judicial Canons "force[ ] him to engage in self-censorship of his desired speech as a . . . sitting judge").) Thus, the only question is whether there exists a credible threat of prosecution. Defendants argue that Justice Parker has failed to establish a credible threat of prosecution because the existence of the canons alone cannot create an "objectively reasonable" fear of such a threat. (Doc. # 51, at 16 (quoting *Pittman v. Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001).) In *Pittman*, the Eleventh Circuit held that a JIC advisory opinion "created an objectively reasonable chill on the First Amendment rights of the Alabama judicial candidates who [were] plaintiffs in [that]

---

[5] This is important because it cuts directly against Defendants' argument that Justice Parker's speech interest ended when he was elected. To the contrary, he has just as strong an interest in speech in his current role as an Associate Justice of the Alabama Supreme Court.

case." 267 F.3d at 1284. From this, Defendants conclude that "Justice Parker must point to some other action taken by [JIC]—such as the issuance of a prospective advisory opinion about his conduct or some other 'threat' of investigation—to constitute that credible threat." (Doc. # 51, at 17.)

Defendants not only misrepresent the standard for determining whether a credible threat exists; they also gloss over the fact that Justice Parker has already once been subjected to investigation based on the alleged violation of the Judicial Canons he now challenges. This is enough to demonstrate that his fear of prosecution is "not imaginary or wholly speculative." *See Babbitt*, 442 U.S. at 302. Just as the Supreme Court held in *Babbit*, *Steffel*, and *American Booksellers*, "the 'pre-enforcement nature' of the suit [is] not 'troub[ling]' because the plaintiff[ ] ha[s] 'alleged an actual and well-founded fear that the law will be enforced against [him].'" *Susan B. Anthony List*, 134 S. Ct. at 2343 (quoting *Am. Booksellers*, 484 U.S. at 393). Justice Parker has standing to bring this preenforcement First Amendment challenge because JIC already has proven the threat of prosecution credible and, at any moment, may start another investigation against him.

### 2. *Justice Parker has standing to sue the Alabama Attorney General.*

The Alabama Attorney General argues separately that Justice Parker lacks standing to sue him because the "enforcement of judicial canons" is not "fairly trace[able]" to any action he undertook, and thus Justice Parker cannot establish the

causation or redressability necessary to demonstrate Article III standing. (*See* Doc. # 13, at 2–3 (quoting *Lujan*, 504 U.S. at 560).) He contends further that "the fact that the Attorney General does not and will not enforce the challenged judicial-ethics provisions against Justice Parker" requires dismissal. (Doc. # 53, at 1.)

The Attorney General confuses the issues. It does not matter, for example, that he did not "play[ ] any role at all in Justice Parker's [previous] ethics investigation" (Doc. # 13, at 4), or that he is not the but-for cause of Justice Parker's injuries (Doc. # 53, at 1), or even that he promises he "will not enforce the challenged judicial-ethics provisions against Justice Parker" (Doc. # 53, at 1). What matters is whether the Attorney General "has the power" to enforce the challenged provision against the plaintiff. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1246 (11th Cir. 1998) (finding a "credible threat of prosecution" and standing to sue the Florida Secretary of State, even after she "disavow[ed] . . . authority to enforce [the law at issue]," because she "ha[d] the power" to enforce the law). Indeed, "[u]nder United States Supreme Court precedent, when a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule." *ACLU v. The Florida Bar*, 999 F.3d 1486, 1490 (11th Cir. 1993) (citing *Diamond v. Charles*, 476 U.S. 54, 64 (1986), which held that "[t]he conflict between

state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy'").

In Alabama, the Attorney General is "the chief law officer of the state," on whom "are conferred various authorities and duties in connection with instituting and prosecuting, in the name of the state, suits and other proceedings at law and in equity for the preservation and protection of the rights and interests of the state." *State ex rel. Carmichael v. Jones*, 41 So. 2d 280, 284 (Ala. 1949); *see also* Ala. Code § 36-15-21 ("All litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General."). Moreover, if the broad provisions of the Alabama Supreme Court and Alabama Code were not enough, Rule 15 of the Alabama Rules of Procedure of the Judicial Inquiry Commission expressly confers upon the Attorney General a "duty," subject to few exceptions, "to prosecute charges filed by [JIC] with the Court of the Judiciary." It is impossible to reconcile this enforcement power with the Attorney General's argument that "there is no connection between the enforcement of the judicial canons or the automatic-disqualification provision and the Attorney General." (Doc. # 13, at 6–7.) The connection is undeniable. Accordingly, Justice Parker has standing to sue the Alabama Attorney General.

**B.**    <u>Sovereign Immunity</u>

The Eleventh Amendment prevents nonconsenting states and state actors from being sued by private individuals in federal court. *See McLendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). *Ex parte Young*, 209 U.S. 123 (1908), created an exception to this general rule, allowing private parties to sue state officers in their official capacities for "prospective equitable relief to end continuing violations of federal law." *Lane v. Cent. Alabama Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (citations and alterations omitted). The Attorney General accepts these well-established principles but argues they do not apply here because there is "no connection" between the enforcement of the judicial canons and his job as Attorney General. (Doc. # 13, at 6–7 ("But *Ex parte Young* requires that the state official 'have some connection with *the enforcement* of the [allegedly unconstitutional] act.'").) This argument fails with respect to sovereign immunity for the same reasons it fails with respect to standing.

Contrary to the Attorney General's suggestion, he is not merely an "official who happens to serve the State." (Doc. # 13, at 7.) He is "the chief law officer of the state," charged with "instituting and prosecuting . . . suits and other proceedings at law and in equity for the preservation and protection of the rights and interests of the state." *Jones*, 41 So. 2d at 284. He is responsible for the "direction and control" of "all litigation concerning the interest of the state, or any department of the state,"

14

Ala. Code § 36-15-21, and he is expressly charged with the duty of prosecuting "charges filed by [JIC] with the Court of the Judiciary," Ala. R. P. Jud. Inq. Comm'n 15. Thus, the Attorney General is sufficiently connected with the enforcement of the Judicial Canons, such that he cannot be excepted from the *Ex parte Young* doctrine.

## C.     Claim for Relief Under the Due Process Clause

Defendants next argue that Justice Parker does not state a claim for a facial or as-applied due process challenge. (Doc. # 26, at 18–22; Doc. # 51, at 20–21.) Before explaining whether Justice Parker has stated a claim, it is important to clarify that "the line between facial and as-applied challenges is a fluid one, and many constitutional challenges may occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation." *Amer. Fed'n of State, Cty., & Mun. Emps. Council v. Scott*, 717 F.3d 851, 865 (11th Cir. 2013). It is also important to note further that "[t]he distinction . . . goes to the *breadth of the remedy* employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (emphasis added). Accordingly, the appropriateness of facial or as-applied relief is a question for another day, and to the extent Defendants argue one or the other (but not both) should be dismissed, the

court defers the issue for a later determination. This section addresses whether Justice Parker has stated any due process claim upon which relief can be granted.[6]

"A § 1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." *Doe v. The Florida Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011). Justice Parker's due process claim challenges Section 159 of the Alabama Constitution, which automatically suspends, "without loss of salary," judges against whom there is a pending JIC complaint. Thus, the property deprivation giving rise to Justice Parker's purported claim is the loss of his office as a justice of the Alabama Supreme Court. (*See* Doc. # 1, at 26.) There is no real dispute over the second element: JIC is clearly an arm of the state. The issues are (1) whether Justice Parker's alleged injury constitutes the deprivation of a constitutionally protected property interest sufficient to trigger the Due Process Clause, and (2) whether the process called for under Section 159 is constitutionally adequate.

---

[6] Defendants' most recent brief challenges Justice Parker's facial First Amendment challenge as "inadequately pled, unripe, and [not presenting] a live controversy in the absence of a meaningful 'as-applied' challenge." (Doc. # 51, at 12–15.) For reasons articulated in Part IV.A., Justice Parker has standing to bring a pre-enforcement challenge, and thus there is a "meaningful 'as-applied' challenge" present. As with the Due Process claim, the court declines to parse the complaint for facial and as-applied allegations in order to determine whether dismissal is appropriate for one and not the other. Stating one is sufficient to survive this stage of the litigation. *See Citizens United*, 558 U.S. at 331.

In *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), the Supreme Court explained that to have a property interest in a benefit, a person "must . . . have a legitimate claim of entitlement to it." *See Doe*, 630 F.3d at 1342. Protectable property interests, however, "are not created by the [federal] Constitution." *Roth*, 408 U.S. at 577. Rather, they are created "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and support claims of entitlement to those benefits." *Id.* The Court in a companion case held further that "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 405 U.S. 422, 430 (1982).

Defendants rely on one case to argue that Justice Parker has no property interest in his position as an Associate Justice of the Alabama Supreme Court. In *Butler v. Ala. Judicial Inquiry Comm'n*, 245 F.3d 1257, 1265 (11th Cir. 2001), the Eleventh Circuit applied *Younger* abstention and declined to hear a suit where, like here, an Alabama Supreme Court justice sued JIC for its enforcement of allegedly unconstitutional judicial canons. On the question of whether an injunction should issue preventing the enforcement of the challenged canons and the suspension of Justice Harold See from office, the court held that the Justice had failed to make a showing of irreparable injury, in part because the loss of his judicial office under

Section 159 did not constitute the loss of a cognizable property interest. The court's explanation is instructive:

> The post of Justice of the Supreme Court of Alabama is not merely a job to which some person might have a right as personal property. Under the law, it is a state office provided by the people of Alabama, provided not for the benefit of the officeholder, but as a public necessity and a means of public service for those persons fortunate enough to be entrusted temporarily with it. Most important, the duties of that office are defined by Alabama law. Justice See, having been charged by a majority of the JIC with an ethics violation during campaigning, has been temporarily disqualified from working at his elected position pending the outcome of the investigation. A temporary disqualification seems to be demanded by the words of the state constitution, a constitution which Alabama judges—including Justice See, as an officer of the court—have sworn to uphold. And even though Justice See might be currently unable to serve through work, the people of Alabama who elected Justice See have collectively spoken through their constitution, which seems to require disqualification in this situation. In the light of the state's law, his legal duty now as a state judge might well be not to work, but to step back and to wait while the state's processes act on his case. Based on these legal facts, we do not think that Justice See nor the citizens of Alabama are suffering irreparable injury sufficient to justify immediate intervention by the federal courts.

*Butler*, 245 F.3d at 1265. *Butler*'s rationale is applicable, even though the context is slightly different here. If Justice See had no cognizable property interest in his post, then neither does Justice Parker. And if Justice Parker has no cognizable property interest in his post, then he cannot state a claim for a denial of due process based on its loss. The only other deprivation Justice Parker pleads is the loss of a liberty interest in his reputation (Doc. # 1, at 27), which cannot alone support a due process claim. *See Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir.

2003) ("To establish a liberty interest sufficient to implicate the [Due Process Clause], the individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law.") (quoting *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302–03 (11th Cir. 2001)).  Because the Eleventh Circuit has held that an Alabama Supreme Court justice does not have a property interest in his judicial office, Justice Parker has failed to demonstrate the loss of a constitutionally protected property interest.  Thus, his due process challenge cannot succeed.[7]

**D.     Mootness**

**1.     *Justice Parker's as-applied First Amendment challenge is not moot.***

Defendants' final argument is that Justice Parker's as-applied First Amendment and Due Process claims are moot.  Because he has already failed to state a due process claim, the court analyzes his First Amendment claim only.

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  Because Article III of the Constitution extends the judicial power only to "cases" and "controversies," it follows that federal courts lack jurisdiction to review disputes that have become "moot."  *See id.* at 496

---

[7] Given this conclusion, the court does not reach the question whether the JIC's pre-suspension process under Section 159 comports with the procedural requirements of the Due Process Clause.

n.7; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000) ("The Constitution's case-or-controversy limitation on federal authority, Art. III, § 2, underpins both our standing and our mootness jurisprudence . . . .").

Defendants argue that Justice Parker's as-applied First Amendment challenge is moot because the ethics investigation has been dropped, no official complaint was filed, his election is over, and he faces no continuing threat of prosecution. (Doc. # 51, at 8–9.) However, as Justice Parker points out, his status as a justice of the Alabama Supreme Court subjects him to the continuing application of the Judicial Canons. As explained in Part IV.A., that fact alone is sufficient to confer on him the standing necessary to bring this pre-enforcement lawsuit. That the investigation and election are over matters not a bit, because Justice Parker's standing depends on neither. His First Amendment claim is ripe for review.

**2.** ***Even if Justice Parker's as-applied First Amendment challenge were moot, the court still could hear the case.***

The Supreme Court over the years has loosened the mootness doctrine considerably. At least two exceptions have emerged from the cases. First, in *Roe v. Wade*, 410 U.S. 113, 125 (1973), the Court famously recognized that controversies, though moot, can be entertained by courts when they are "capable of repetition, yet evading review." Similarly, "[i]t is well-settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189

(quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). In fact, a defendant's voluntary conduct moots a case only when "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). And, in such voluntary cessation cases, the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (quotation marks and citations omitted). Federal courts may decide moot cases where at least one of these exceptions applies.

Both mootness exceptions would apply here. First, it is alleged that JIC is willing to initiate investigations that chill protected speech of judges, thus, making such investigations "capable of repetition." *See Roe*, 410 U.S. at 125. And if claims challenging such investigations were mooted whenever JIC decided the investigation was not worth a lawsuit, the claims also would continue to "evad[e] review." *Id.* Thus, there is here "a reasonable expectation that the same complaining party would be subjected to the same action again," and the ability of JIC to escape litigation by ceasing its investigation would ensure that "the challenged action [would be] in its duration too short to be fully litigated prior to its cessation." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990).

Second, the mootness question has arisen in this case only because JIC voluntarily decided to halt the investigation—*i.e.*, because of Defendants' *voluntary cessation* of the challenged practice.  The fact that the cessation occurred during the pendency of this lawsuit gives the court no strong assurances that the JIC would hesitate to enforce the challenged provisions in the future.  Defendants argue that the state is entitled to a presumption requiring the court to assume its challenged conduct will not recur.  *See Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004).  However, it is not at all clear the presumption would apply in this context.  The discussion in *Troiano* assumes a specific kind of case: one in which the state's subsequent repeal of a law moots a challenge thereto. This is the sort of "voluntary cessation" that would entitle the state to a favorable presumption.  The court in *Troiano* explains that the Supreme Court has "rejected an assertion of mootness in [challenges to ceased governmental conduct] *only* when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated."  *Id.* at 1283–84.  Here, the challenged policy would not have to be reinstated—it was never repealed.  Thus, it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U.S. at 189.  Moreover, whether it is "absolutely clear" that Defendant's reopening of the investigation of Justice Parker could "not be reasonably expected to recur," *Friends of the Earth*, 528 U.S. at 189, is a question of fact as to whether

Defendant's voluntary cessation of the investigation moots the case. Defendants have not met their "heavy burden of persua[ding] the court that" they will not continue to enforce the Judicial Canons in a way that will chill speech in the future.

## V. CONCLUSION

Accordingly, it is ORDERED as follows:

1. Defendants' Motions to Dismiss (Docs. # 51, 53) are DENIED as to all of Justice Parker's claims, except those brought pursuant to the Due Process Clause;

2. Defendants' Motions to Dismiss (Docs. # 51, 53) are GRANTED in part, only as to Justice Parker's due process claims; and

3. Justice Parker's due process claims are DISMISSED with prejudice.

It is further ORDERED that Defendants shall file an answer to the Complaint on or before **September 14, 2017**.

DONE this 31st day of August, 2017.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
