IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HON. TOM PARKER, Associate Justice, Supreme Court of Alabama, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:16-CV-442-WKW |
| JUDICIAL INQUIRY COMMISSION OF THE STATE OF ALABAMA, BILLY C. BEDSOLE, in his official capacity as Chairman of the Judicial Inquiry Commission of the State of Alabama, RANDALL L. COLE, CRAIG S. PITTMAN, DAVID THRASHER, RALPH D. MALONE, KIM J. CHANEY, DAVID A. KIMBERLY, and MAIBETH J. PORTER, in their official capacities as members of the Judicial Inquiry Commission of the State of Alabama, and STEVEN T. MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are the Renewed Motion for Preliminary Injunction by

Plaintiff Justice Tom Parker (Docs. # 82 & 83) and the Motion for Partial

Summary Judgment by Defendant Judicial Inquiry Commission ("JIC" or "Commission") and its individual members (Doc. # 92). Defendant Attorney General Steve Marshall joins and adopts the Commission's opposition to the preliminary injunction motion. (Doc. # 93.) Justice Parker's motion will be granted in part and denied in part, and the JIC's motion will be denied.

## I. BACKGROUND

As more fully recounted in the court's previous Order (Doc. # 64) on Defendants' motions to dismiss, Justice Tom Parker was investigated by the Judicial Inquiry Commission for comments he gave on a radio talk show on October 6, 2015, as part of his reelection campaign for the Alabama Supreme Court. The topic of discussion was the relationship between federal and state courts, especially as it pertained to the U.S. Supreme Court's decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). That decision, which struck down as unconstitutional state laws that excluded homosexual relationships from recognition of marriage, was issued on June 26, 2015.

During the same period the U.S. Supreme Court was grappling with questions of marriage, so, too, was the Alabama Supreme Court, on which Justice Parker served. *See Ex parte State ex rel. Ala. Policy Inst.*, 200 So. 3d 495 (Ala. 2015) ("*API*"). Indeed, three months before *Obergefell* came down, the Alabama Supreme Court issued a writ of mandamus enjoining Alabama probate judges from

issuing marriage licenses to homosexual couples.[1]  *Id.* at 552.  Once *Obergefell* changed the landscape, the Alabama Supreme Court invited the *API* parties to submit briefing addressing the effect of the U.S. Supreme Court's decision on the court's injunction.  *See Moore v. Ala. Judicial Inquiry Comm'n*, — So. 3d —, 2017 WL 1403696, at *3 (Ala. Apr. 19, 2017) (outlining complex procedural history of *API*).  Nine months later, on March 4, 2016, the Alabama Supreme Court issued its final order in the *API* case, dismissing all pending motions and petitions.  *API*, 200 So. 3d at 561.

It was during this additional briefing period—after *Obergefell* but before the Alabama Supreme Court's final order in *API*—that Justice Parker took to the airwaves.  As Justice Parker explained on the radio, "[W]e're [*i.e.*, the Alabama Supreme Court] faced with the question [of] what is the continued effectiveness of that March decision from the Alabama Supreme Court" in the wake of *Obergefell*.  (Doc. # 1-1, at 13.)  He continued:  "[W]e have right now, before the Alabama Supreme Court, a further petition by those probate judges who were before the court earlier asking that their religious liberty rights be defended.  Let's see if our court will rise up and do that."  (Doc. # 1-1, at 13.)

Justice Parker then argued that unpopular judicial decrees like *Obergefell* were a result of unelected judges not being accountable to the people, and

---

[1]  The Alabama Supreme Court issued a per curiam opinion, which Justice Parker joined. He did not write separately.  *See API*, 200 So. 3d at 552.

explained that the answer to this problem was judicial elections, which "keep judges in line." (Doc. # 1-1, at 15.) This prompted a broader dialogue about federalism, the role of the Tenth Amendment in modern jurisprudence, and the ability of states to serve as "a check on the federal government." (Doc. # 1-1, at 17.) According to Justice Parker, one check could be a state's refusal to accept the legitimacy of *Obergefell*, in the same way that Wisconsin refused to accept the U.S. Supreme Court's decision in *Dred Scott v. Sandford* back in 1857. (Doc. # 1-1, at 11.) Thus, "resisting [the *Obergefell*] decision could maybe sta[rt] a revival of what we need in this country to return to our original founding principles."[2] (Doc. # 1-1, at 17.)

On October 12, 2015, the Southern Poverty Law Center filed a complaint with the JIC about Justice Parker's comments. (Doc. # 1-1, 1-2.) The JIC notified Justice Parker that it was opening a judicial conduct investigation based on the complaint, and had decided to investigate the following allegations:

---

[2] Justice Parker echoed these sentiments in his special concurrence to the Alabama Supreme Court's March 4, 2016 order dismissing all pending motions and petitions in the *API* case. *See API*, 200 So. 3d at 606–11 (Parker, J., concurring). There, Justice Parker "concur[red] specially to state that *Obergefell* conclusively demonstrates that the rule of law is dead," *id.* at 606, that state court judges "have sworn an oath to uphold the United States Constitution," not to "blindly follow the unsubstantiated opinion of 'five lawyers,'" *id.* at 611 (quoting *Obergefell*, 135 S. Ct. at 2612 (Roberts, C.J., dissenting)), and that "[a]n illegitimate decision is due no allegiance," *id.*

1. In your October 6, 2015 interview on Mr. Bryan Fischer's Focal Point radio show, you violated Canon 3A(6)[3] by publicly commenting on [*API*], No. 1140460, then pending before the Alabama Supreme Court.

2. You violated Canons 1[4] and 2A[5] by making comments on the Focal Point radio show that undermine the integrity of and public confidence in the integrity of the federal judiciary and the United States Supreme Court's interpretation of the Constitution in *Obergefell v. Hodge[s]*, e.g., suggesting that the Alabama Supreme Court should defy and refuse to give effect to the Supreme Court's decision in *Obergefell*.

(Doc. # 1-3, at 2.)

The Commission's investigation was still ongoing when Justice Parker filed this suit on June 15, 2016, challenging Alabama Canons of Judicial Ethics 1, 2A, and 3A(6) as unconstitutional. (Doc. # 1.) After this court granted Defendants' motion to dismiss on *Younger* abstention grounds and the case was on appeal, the JIC dropped its investigation, and the Eleventh Circuit kicked the case back to this court for a determination of whether dropping the investigation made the whole thing moot. It did not. (Doc. # 64, at 19–23.) The case was (and is) not moot

---

[3] ["A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court." Ala. Canon of Judicial Ethics 3A(6).]

[4] ["A judge should uphold the integrity and independence of the judiciary." Ala. Canon of Judicial Ethics 1.]

[5] ["A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Ala. Canon of Judicial Ethics 2A.]

because Justice Parker is still subject to the canons of judicial ethics he challenges, and the capable-of-repetition-yet-evading-review exception applies because "it is alleged that JIC is willing to initiate investigations that chill protected speech of judges"—hence capable of repetition—and the JIC voluntarily ceased its investigation—hence evading review. *See Roe v. Wade*, 410 U.S. 113, 125 (1973). (Doc. # 64, at 20–23.)

This sets the stage for Justice Parker's present motion: that the court prevent the whole escapade from happening again by issuing a preliminary injunction enjoining Defendants "from enforcing or applying Canon 3A(6) of the Alabama Canons of Judicial Ethics to Justice Parker's protected speech and conduct under the First Amendment." (Doc. # 82, at 1.) Such an injunction is required, Justice Parker contends, because he is currently campaigning for the position of Chief Justice of the Alabama Supreme Court (election date: November 6, 2018), and he "would like to be able to engage in the discussion of the important matters" related to his candidacy. (Doc. # 83-1, at 3.) "However, because of the recent investigation by the JIC into [his] protected speech and complaints raised by various groups opposed to [his] position on certain matters, [he] ha[s] been chilled, and continue[s] to be chilled in [his] expression, and [he] [is] forced to self-censor." (Doc. # 83-1, at 3.) He does not seek injunctive relief under any other Canon.

## II.    JURISDICTION AND VENUE

Jurisdiction is proper under 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue.

## III.    DISCUSSION

### A.    <u>Preliminary Injunction</u>

The sole judicial ethics canon from which Justice Parker seeks immediate equitable relief is Canon 3A(6):

> A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control.  This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

Ala. Canon of Judicial Ethics 3A(6).

For Justice Parker to prevail, he bears the burden of demonstrating that (1) he has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered until the injunction issues; (3) the threatened harm to him outweighs any damage the injunction might cause the JIC and the Alabama Attorney General; and (4) the injunction would not be adverse to the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  Because a preliminary injunction is an "extraordinary and drastic remedy," it should not be granted unless "the movant clearly establishes the burden of persuasion as to each of the four prerequisites."  *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177,

1198 (11th Cir. 2009) (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).  The decision to grant or deny a preliminary injunction is within the sound discretion of the district court.  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

## 1. *Likelihood of Success on the Merits*

### a. **Whose Speech? Which Scrutiny?**

The parties agree that Justice Parker's challenge to Canon 3A(6) is a First Amendment free speech claim, as incorporated and made applicable to the states by the Fourteenth Amendment.  This is where agreement ends.  While Justice Parker sees Canon 3A(6) as an overbroad, content-based restriction on his political speech that should be struck down under strict scrutiny, the Commission contends that any speech curtailed by Canon 3A(6) is not protected speech to begin with.  This is because any speech by Justice Parker about a pending or impending case is in fact government speech, and the "Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  (Doc. # 92, at 17 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2000) (citations and emphasis omitted)).)  Moreover, says the Commission, even if Justice Parker's speech were his own, it would still be proscribable because it falls within the "well-defined and narrowly limited class[] of speech, the prevention and punishment of which ha[s] never been thought to raise any Constitutional

problem." (Doc. # 92, at 20 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)).)  While the Commission admits that "it may seem odd to equate a judge's speech about a pending or impending case with other traditional categories of unprotected speech," it is nevertheless "self-evident" that the same factors would apply to make the comparison work.  (Doc. # 92, at 21.)

Suffice it to say, this is not one of those "proposition[s] too self-evident to have been questioned."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 413 (1819).  Though it is true the Supreme Court once described certain categories of speech as outside the protection of the First Amendment—"the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words," *Chaplinsky*, 315 U.S. at 571–72—the Court has been careful to eschew the substitution of that *description* as an underlying *test*.  *See United States v. Stevens*, 559 U.S. 460, 470–72 (2010).  Instead, the Supreme Court has since explained its past categorization of unprotected speech as consistent with its normal free speech doctrine,[6] and expressly disclaimed any "freewheeling authority to declare new categories of speech outside the scope of the First Amendment."  *Id.* at 472.  That seems reason enough not to proclaim Justice Parker's campaign speech generally (*i.e.*, speech related to issues of interest to voters but unrelated to a specific pending case or

---

[6]  At least, this is the case when the past categorizations have stood up to later scrutiny, which many have not.  *See, e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (lewd and libelous speech protected); *Cohen v. California*, 403 U.S. 15, 26 (1971) (lewd speech protected); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–86 (1964) (libelous speech protected); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 504 (1952) (profane speech protected).

party to a case) as falling outside the orbit of First Amendment protection. As Alexander Pope might have put it, only foolish district courts rush in where the Supreme Court itself fears to tread. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1667 (2015) ("[T]he First Amendment fully applies to [a judicial candidate's] speech.").

The Commission's government-speech argument fares no better. Its argument here is not simply that Alabama may regulate the political speech of its judicial officers—that argument comes later—but that Justice Parker's speech about any pending or impending proceeding is itself "quintessential government speech." (Doc. # 92, at 18.) It is for this reason the Commission relies on the Supreme Court's decision in *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009), which held that a city's decision to display certain monuments in a park, and not to display others, was permissible since it was discriminating only among its own speech choices. In reaching the conclusion that the monuments constituted government speech, the Supreme Court explained that, while "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech," "this case does not present such a situation": "Permanent monuments displayed on public property typically represent government speech." *Id.* at 470. Here, the inverse is true: While there may be instances in which a sitting Justice on a state's highest court

could be seen as speaking on behalf of the government or the judiciary, election speeches and radio interviews made during a political campaign typically represent private political speech.

This conclusion is buttressed by the Supreme Court's two forays into the world of judicial ethics canons challenged on free speech grounds: *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), and *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015). In *White*, the Court struck down a prohibition on a "candidate for a judicial office, including an incumbent judge," from "announc[ing] his or her views on disputed legal or political issues," 536 U.S. at 768 ("issues" in the broadest sense: political, legal, social, historical—issues that may be on the minds of voters). In *Williams-Yulee*, the Court upheld a limitation on "[a] candidate, including an incumbent judge, for a judicial office" from "personally solicit[ing] campaign funds," 135 S. Ct. at 1663 (a discrete campaign issue, not likely to be an issue in cases unrelated to campaigns). Although the challengers in both cases were non-incumbent candidates, the Court's discussion in neither case turned on this fact—and it would be strange if it had, as if the line between government and private speech could be based solely on whether a candidate was already a judge. The discussion in both cases keyed on the state's interest in preserving the integrity of state judicial systems in the eyes of the citizenry.

So if the speech curtailed by Canon 3A(6) is neither government speech nor an unprotected category, what is it, what are the interests involved, and which level of scrutiny applies? Here *White* and *Williams-Yulee* are also helpful, but their other lessons require a bit more explication. In *White*, Justice Scalia, writing for a 5-4 majority, explained that Minnesota's announce clause prohibited "a judicial candidate from stating his views on any specific nonfanciful [*i.e.*, real] legal question within the province of the court [*i.e.*, including cases not presently pending] for which he is running, except in the context of discussing past decisions." 536 U.S. at 773. This restriction both prohibited speech on the basis of its content and burdened "a category of speech that is at the core of our First Amendment freedoms—speech about the qualifications of candidates for public office." *Id.* at 774 (internal quotation marks and citation omitted). Strict scrutiny was therefore appropriate, meaning that Minnesota had the burden of showing that the restriction (1) was narrowly tailored—that it did not "unnecessarily circumscrib[e] protected expression"—and (2) served a compelling state interest. *Id.* at 775 (alteration in original) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54 (1982)).

Minnesota argued that its interests were preserving (1) the impartiality of the state judiciary, and (2) the appearance of the impartiality of the judiciary—the first to protect the due process rights of litigants, the second to instill public confidence

in the judicial system.  *Id.*  The Supreme Court rejected the suggestion that the announce clause was narrowly tailored to serve these interests, and instead held that the restriction was both overbroad and underinclusive.  If the restriction was aimed at preventing bias against parties, then "the clause [was] barely tailored to serve that interest *at all*, inasmuch as it d[id] not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*."  *Id.* at 776.  And if the canon was aimed at preventing a judge's preconception in favor of a particular legal view, then the restriction was woefully underinclusive (and the interest likely not compelling to begin with).  *Id.* at 777–80.  Thus, "*even if* the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns, the announce clause still fail[ed] strict scrutiny."  *Id.* at 783.  The Court concluded:

> [T]he notion that the special context of electioneering justifies an *abridgement* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head.  "[D]ebate on the qualification of candidates" is "at the core of our electoral process and of the First Amendment freedoms," not at the edges. . . . "It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign."  We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

*Id.* at 781–82 (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222–23 (1989) and *Brown*, 456 U.S. at 60, respectively).

After *White*, courts began striking down similar canons, usually on the grounds that they were overbroad and/or underinclusive. *E.g.*, *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744, 747 (9th Cir. 2012) (striking down Montana's statute prohibiting a political party from "endors[ing], contribut[ing] to, or mak[ing] an expenditure to support or oppose a judicial candidate"); *Carey v. Wolnitzek*, 614 F.3d 189, 201–07 (6th Cir. 2010) (striking down Kentucky's regulations prohibiting judicial candidates from soliciting campaign funds and identifying as members of political parties); *Siefert v. Alexander*, 608 F.3d 974, 981–83, 990 (7th Cir. 2010) (striking down Wisconsin's statute prohibiting judicial candidates from being members of political parties); *Jenevein v. Willing*, 493 F.3d 551, 560 (5th Cir. 2007) (holding that Texas's judicial ethics canon that prohibited the "appearance of impropriety" failed strict scrutiny as applied to a judge who spoke publicly about a case pending in another court); *Weaver v. Bonner*, 309 F.3d 1312, 1315, 1320–21 (11th Cir. 2002) (striking down Georgia's prohibition on judicial candidates from issuing public communications that were "false, fraudulent, misleading, deceptive, or which contain a material misrepresentation"); *see also Butler v. Ala. Judicial Inquiry Comm'n*, 802 So. 2d 207, 213 (Ala. 2001) (striking down, pre-*White*, Alabama's judicial ethics canon restricting judicial candidates from publicizing information about an opponent that would be "misleading to a reasonable person").

Then came *Williams-Yulee*. Before the Supreme Court was a challenge to Florida's judicial ethics canon prohibiting judicial candidates from "personally solicit[ing] campaign funds," but allowing them to establish campaign committees to raise money. 135 S. Ct. at 1663. Walking back some of the language in *White*, Chief Justice Roberts, writing for a 5-4 court, emphasized that "[j]udges are not politicians, even when they come to the bench by way of the ballot," and that "a State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office." *Id.* at 1662. Strict scrutiny was still appropriate, however; the state's interests simply differed. *Id.* at 1665 (plurality opinion).[7] The Court then found that Florida's interest in "safeguarding public confidence in the fairness and integrity of the nation's elected judges" was a compelling one. *Id*. at 1666 (majority opinion) (quoting *Capterton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)). "Simply put, Florida and most other States have concluded that the public may lack confidence in a judge's ability to

---

[7] Justice Ginsburg and Justice Breyer did not join the section of the Court's opinion adopting strict scrutiny review, and instead advocated that a lesser standard apply to judicial elections. *See Williams-Yulee*, 135 S. Ct. at 1673 (Breyer, J., concurring); *id.* at 1673–74 (Ginsburg, J., concurring). The dissenting justices, however, agreed that strict scrutiny was appropriate. *See id.* at 1676 (Scalia, J., dissenting); *id.* at 1682 (Kennedy, J., dissenting); *id.* at 1685 (Alito, J., dissenting). Moreover, barely two months after *Williams-Yulee* was released, the Supreme Court expressly held that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

administer justice without fear or favor if he comes to office by asking for favors." *Id.*

Turning to the question of narrow tailoring, the Court held that the overbroad and underinclusive concerns of *White* did not doom Florida's restriction. As for the former, the Florida canon "le[ft] judicial candidates free to discuss any issue with any person at any time. . . . They [just] cannot say, 'Please give me money.'" *Id.* at 1670. And as for the latter, "[a]lthough a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Id.* at 1668 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). In sum, "[j]udicial candidates have a First Amendment right to speak in support of their campaigns. States have a compelling interest in preserving public confidence in their judiciaries. When the State adopts a narrowly tailored restriction like the one at issue here, those principles do not conflict. A State's decision to elect judges does not compel it to compromise public confidence in their integrity." *Id.*

In some ways, the evolution from *White* to *Williams-Yulee* is important. It is hard to deny that "the strict First Amendment framework of *White*[] underwent significant changes with the Supreme Court's decision in *Williams-Yulee*." *French v. Jones*, 876 F.3d 1228, 1233 (9th Cir. 2017). But "significant changes" do not a reversal equal. Though there is tension in the reasoning of the two cases—after all,

the author of the former dissented in the latter, protesting that the state's tailoring was "as narrow as the Court's scrutiny is strict," *Williams-Yulee*, 135 S. Ct. at 1679 (Scalia, J., dissenting)—the two cases can, and therefore must,[8] be read together.

Some of the rules that emerge from the confluence are these. First, strict scrutiny applies. Second, there do exist "rare cases in which a speech restriction withstands strict scrutiny." *Williams-Yulee*, 135 S. Ct. at 1666. Scrutiny in this area is not "strict in theory, but fatal in fact." *Id.* (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)). Notable is the factual distinction between "issues" speech and "give me money" speech. "Issues" speech can and does implicate cases; "money" speech is purely an ethical consideration that would never arise in a case outside electioneering subject matter. Third, preserving public confidence in the integrity of the judiciary can be a compelling state interest. *Id.* Fourth, states do not have to treat elected judges and non-judicial politicians alike; they "may regulate judicial elections differently than they regulate political elections." *Id.* at 1667.[9] And fifth, it is not just judges and

---

[8] *See* Bryan A. Garner *et al.*, *The Law of Judicial Precedent* 155, 301–02 (2016) (explaining that a federal court presented with seemingly conflicting vertical precedents "has a duty to reconcile them"). Whether *White* and *Williams-Yulee* "seemingly" conflict or not, they address the same public policy concern—preserving public confidence in the judiciary—but very different speech concerns. *White* addresses a judge's speech on broad issues of public interest; *Williams-Yulee* addresses "give me money" speech by a judge.

[9] To the extent the Eleventh Circuit held differently in *Weaver*, the Supreme Court's subsequent clarification abrogates that specific aspect of the court's opinion. *Cf. Weaver*, 309

judicial candidates who have an interest in speaking; voters also have an interest in hearing them speak. *See White*, 536 U.S. at 787 (decrying clause that "place[d] most subjects of interest to the voters off limits").

### b. Constitutionality of Canon 3A(6)

As noted above, Justice Parker carries the initial burden to obtain a preliminary injunction. But in determining the likelihood of success on the merits, "the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). Here, that burden falls to Defendants because strict scrutiny applies.

Canon 3A(6) is a content-based restriction: If the subject of the judge's statement is "about a pending or impending proceeding in any court," then the "judge should abstain from public comment." Ala. Canon of Judicial Ethics 3A(6); *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. This burden remains the same even in the context of a motion for a preliminary

---

F.3d at 1321 ("[W]e do not believe that the distinction, if there truly is one, justifies greater restrictions on speech during judicial campaigns than during other types of campaigns.").

injunction. *See Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004). Accordingly, it is Defendants who bear the burden of showing that Canon 3A(6) passes strict scrutiny review.

The Attorney General offers that the interest behind Canon 3A(6) is "the protection and preservation of public confidence in the integrity and impartiality of the State's judiciary." (Doc. # 93, at 1.) As the Supreme Court made clear in *Williams-Yulee*, there is no doubt this constitutes a compelling state interest. 135 S. Ct. at 1666. Nor does Justice Parker dispute that it is. (Doc. # 83, at 11; Doc. # 99, at 27.) The question is simply one of fit.

Before turning to the question of tailoring, however, it is important to "construe the challenged [canon]; it is impossible to determine whether a [canon] reaches too far without first knowing what the [canon] covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The ordinary meaning of the text of Canon 3A(6) encompasses public comments about "pending or impending proceeding[s] in *any* court," no matter how far away from Alabama the court may be, no matter how improbable it is that the case would wind up before an Alabama court, and no matter how remote the possibility that the judge's comments could affect the proceedings. *See In re Inquiry of Broadbelt*, 683 A.2d 543, 507–08 (N.J. 1996) ("The phrase 'any court' has been interpreted to refer to any court in any jurisdiction." (collecting cases)). It proscribes any public comment whatsoever by

a judge[10] about such proceedings, unless the comment is given "in the course of [the judge's] official duties" or is provided to "explain[] for public information the procedures of the court." Ala. Canon of Judicial Ethics 3A(6). Moreover, the prohibition is not limited to the merits of a proceeding[11] or to issues that are determinative of a proceeding. Finally, and most pertinent to this case, the prohibition reaches political speech given during a campaign, but it covers much more.

Such was the interpretation given the language by the ABA's Standing Committee on Ethics and Professional Responsibility when it voted to revise the 1972 Model Code of Judicial Ethics—whence comes Alabama's version—to change the canon to prohibit only judges' comments that "might affect the outcome or fairness of a trial or hearing." Lisa L. Milord, *The Development of the ABA Judicial Code* 21 (1992). As that Committee explained,

> The language of the 1972 Code's provision prohibiting any public comment about a pending or impending proceeding was believed by the Committee to be overbroad and unenforceable. For example, judges in their extra-judicial teaching and writing often refer to

---

[10] Canon 3A(6) governs a sitting-judge candidate. No one here disputes that Rule 8.2(b) of the Alabama Rules of Professional Conduct applies similar campaign speech restraints to a non-judge candidate for judicial office: "A lawyer who is a candidate for judicial office shall comply with the applicable provision of the Alabama Canons of Judicial Ethics, and failure to so comply with the Alabama Canons of Judicial Ethics shall constitute a violation of this disciplinary rule."

[11] North Carolina, Delaware, and the federal courts apply the restriction to the *merits* of a pending matter or proceeding. (*See* Doc. # 92-1.)

pending or impending cases in other jurisdictions without diminishing the fairness of those cases or the appearance of judicial impartiality.

*Id.* Though it matters not whether the Committee thought the language enforceable—nor that many, though not all,[12] states have since followed the model version and tightened the text—the revision does highlight the broad nature of the Canon's ordinary meaning.

Yet while certainly geographically unconstrained, the reach of the provision is not as bottomless as Justice Parker intimates. Justice Parker notes that in his radio interview, he discussed "political, judicial and constitutional theory, structures of government and its different branches, key public issues such as the role of the judiciary, constitutional interpretation, and marriage, and important legal history." (Doc. # 83, at 8.) While "he would like to be able to discuss [these issues] freely without fear of reprisal," he is now "forced to self-censor on such issues" due to Canon 3A(6). *Id.* But Justice Parker *can* discuss those issues—at least, it is not the ordinary meaning of Canon 3A(6) that prevents him from doing so. As written, the Canon precludes discussing them only as part of a conversation about a pending or impending proceeding. *Cf. Williams-Yulee*, 135 S. Ct. at 1670 ("[I]n reality, [Florida's canon] leaves judicial candidates free to discuss any issue with any person at any time. . . . [But] [t]hey cannot say, 'Please give me

_____

[12] *See* Doc. # 92-1, at 2–3 (analyzing similar canons in all fifty states and the District of Columbia). Alabama adheres to the original language from the 1972 Model Code.

money.'"). As noted earlier, *Williams-Yulee* did not concern "issues" speech at all; it concerned speech in a political campaign that implicated purely ethical concerns, *i.e.*, a judicial candidate seeking favors.

Having construed the Canon, the next question is whether the Canon is narrowly tailored to a compelling state interest. And here, it must be said that the lack of geographic restriction does not necessarily doom the Canon. As Justice Scalia complained in *Williams-Yulee*, the canon at issue there "applie[d] even when the person asked for a financial contribution has no chance of ever appearing in the candidate's court." *Id.* at 1677 (Scalia, J., dissenting). Even so, the imperfect tailoring and slight broadness in the shoulders did not change the majority's conclusion that the canon did not need to be returned to the tailor.

But Alabama's Canon 3A(6) is not the same as Florida's ban of in-person solicitation, and the fit appears even looser. True, the compelling state interest in *Williams-Yulee* was likewise judicial integrity—which "does not easily reduce to precise definition," *id.* at 1667 (majority opinion)—but it was judicial integrity of a specific kind: to counter the fear "that the public may lack confidence in a judge's ability to administer justice without fear or favor if he comes to office by asking for favors," *id.* at 1666. The link between the problem (asking for money) and the solution (restricting judicial candidates from personally engaging in "money speech") was clear, and the slice of speech cut from the pie was narrow.

Moreover, the state also provided an alternative to the right it restricted: While judicial candidates could no longer directly ask contributors for money, their campaign committees could.

In contrast, in *White*, Minnesota's interest was broadly labeled "judicial integrity," but it was of no specific kind or flavor; the problem it sought to counter was amorphous ("Respondents are rather vague . . . about what they mean by 'impartiality,'" 536 U.S. at 775); and the slice of speech carved out was a sloppy double portion. This was true even though Minnesota's announce clause had been construed by the lower court to reach "only disputed issues that are likely to come before the candidate if he is elected judge." *Id.* at 771. Indeed, it was precisely *because* the speech ban reached those disputed *issues* that it was so problematic. As the Supreme Court explained, "philosophical generalities[] ha[ve] little meaningful content for the electorate unless [they are] exemplified by application to a particular *issue* of construction likely to come before a court—for example, whether a particular statute runs afoul of any provision of the Constitution." *Id.* at 773 (emphasis added). Not mentioned but nevertheless obvious, Minnesota's rule also allowed candidates to hide behind it to avoid voters learning of the candidates' positions on matters of great public interest. The rule thus served as an official mechanism for intellectual fleecing of the voters.

That is the rub here.  Canon 3A(6) removes from the orbit of protected speech any discussion of ongoing or impending court *proceedings*, but as in all other iterations[13] says nothing about speech restrictions on *issues*.  (*See* Doc. # 92-1, at 2–3.)  Some speech concerning some proceedings is worth curtailing in some circumstances—when a case is pending before the court on which the candidate sits (or seeks to sit), for instance, or when a case could conceivably get there.  As the Commission points out, it could be that allowing judges to speak about those kind of proceedings "would undermine the appearance of judicial open-mindedness and impartiality that is central to our court system, and it would undermine the public's confidence in receiving a fair proceeding."  (Doc. # 92, at 46.)  And a state has a compelling interest in preventing a judge from "improperly forecasting on how he or she will rule" in a specific decision.  (Doc. # 92, at 49.)  The integrity of the court system depends generally on enforcement of that ethical notion.

But even assuming these compelling interests, it is not clear how Defendants' reasoning extends to the full reach of the Canon's proscription.  Why would the public's confidence be undermined by a judge speaking about an ongoing proceeding in Arizona or Angola?  When it comes to preserving the

---

[13]  When the federal, North Carolina, and Delaware counterparts prohibit discussion of "the merits" of a pending proceeding, issues that are material to or determinative of the outcome of a proceeding may not be addressed by a sitting judge.

judicial integrity of Alabama state judges, is speaking about a case pending before the Alabama Supreme Court really the same as discussing the merits of an appeal before the Supreme Court of Seychelles?

More generally, what is the state interest in outlawing speech that cannot be seen as affecting the outcome or impairing the fairness of a proceeding? While the geographic examples well illustrate how such instances can arise, by no means are they the only way. For instance, how would speaking about a case that has no chance of coming before the Alabama court on which a judge sits (speech that is not currently allowed) be different from speaking about past cases (speech which is allowed)? And what is Alabama's interest in preventing a judge from responding publicly to allegations made by litigants in order to obtain the judge's recusal? If the judge recuses, then any subsequent speech would fall afoul of Canon 3A(6) because it would not be made in the course of the judge's official duties and would concern a pending proceeding in another court. Yet the Fifth Circuit has expressly held that a state's interests in "preserving the public's faith in the judiciary and litigants' rights to a fair hearing" are not advanced by "shutting down completely such speech." *Jenevein*, 493 F.3d at 560.

All these examples reveal that Alabama currently treats "proceedings" and "issues" alike, and therein lies the conceptual problem. Nor is it just an Alabama problem. All iterations of this canon across the country address only

"proceedings" or "matters" without express consideration of "issues." Whereas a "proceeding" refers to a particular legal action involving particular questions and parties, an "issue" is a more general category—even though issues obviously arise in the context of proceedings. A judicial candidate's discussion of *issues* is protected by the First Amendment. The problem arises when the issue relates directly to a proceeding.

This tension, though difficult to reconcile in some settings, may be illuminated by the example of the death penalty. At the trial on this case, the court would be interested to know if any party seriously contends that a judicial candidate in Alabama or elsewhere is precluded from publicly giving his or her opinion on the death penalty generally, even though doing so necessarily implies giving an opinion as to the constitutionality of the procedure. *Compare, e.g.*, Ala. Judicial Inquiry Comm'n, Ala. Judicial Ethics Op. 94-537, 1994 WL 16851946, at *1 (1994) ("[A] candidate should not respond to questions concerning *issues* that are likely to come before them in their judicial capacity." (emphasis added)), *with Bauer v. Shepard*, 634 F. Supp. 2d 912, 926 (N.D. Ind. 2009) ("Candidates have a constitutional right to state their views on, for example, abortion or the death penalty . . . ." (quoting Ind. Comm'n on Judicial Qualifications, Preliminary Advisory Op. #1-02)).

This is the other side of the Supreme Court's recognition in *White* that, for a voter, a candidate's discussion of an ongoing proceeding in Andorra is important not because of the parties involved or the particularities of that specific controversy, but because of the *issues* the case raises. *See* 536 U.S. at 773. And a judicial candidate's view of *issues*, especially local and domestic ones, is of immense interest to an electorate choosing which judicial candidate to support. Yet when Alabama prohibits judicial candidates from speaking about them simply because they happen to arise in the context of a proceeding somewhere, the state has shirked its responsibility of narrowly tailoring its speech restrictions. *Cf. id.* at at 766 ("[T]he clause is barely tailored to serve [the interest of impartiality] *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*."). The discussion of an *issue* related to a proceeding, but not about the merits thereof, is protected by the First Amendment, and *White* and *Williams-Yulee* do not say otherwise.

While "there is nothing wrong in general with a rule's being overinclusive[,] . . . when an overinclusive rule has the effect . . . of greatly curtailing an important part of the speech 'market,' the rule is deeply problematic." *Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224, 229 (7th Cir. 1993). Perhaps there are compelling answers why Alabama's Judicial Ethics Canon needs to be this broad. But if so, it is Defendants' burden to provide them, and this they have

not yet done.  As all parties are aware (and spend much of their briefing debating), Alabama is one of about six states without a geographic or other restriction concerning what counts as a pending or impending proceeding about which the judge should not publicly comment.  (*See* Doc. # 92-1, at 2–3 (comparing versions of Canon 3A(6) in all fifty states and the District of Columbia).)  Most other states limit the restriction to either (1) cases pending or impending in a court in that state, or (2) statements that might reasonably be expected to affect the outcome or impair the fairness of a proceeding.  (Doc. # 92-1, at 2–3.)  That trend alone does not mean Alabama's Canon is invalid.  "It does, however, raise concern that the [state] has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which [Justice Parker] wish[es] to engage."  *McCullen v. Coakley*, 134 S. Ct. 2518, 2537 (2014).  Because it is Defendants' burden to prove that such "alternatives will not be as effective as the challenged statute," *Ashcroft*, 542 U.S. at 666, and because Defendants have offered no compelling reason why they would not be, it follows that Defendants have not met their burden of showing narrow tailoring by the least restrictive means available.

Much of the same reasoning applies to Justice Parker's overbreadth argument.  "An overbreadth challenge is based on the statute's 'possible direct and indirect burdens on speech.'"  *United States v. Acheson*, 195 F.3d 645, 650 (11th

28

Cir. 1999) (quoting *Am. Booksellers v. Webb*, 919 F.2d 1493, 1499–500 (11th Cir. 1990)). A law may be considered overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Because the doctrine is designed to protect "the public from the chilling effect such a statute has on protected speech," a challenged law can be overbroad "even though the governmental entity enforced the statute against those engaged in unprotected activities." *Weaver*, 309 F.3d at 1318 (quoting *Acheson*, 195 F.3d at 650). Such is the case here. Even if Justice Parker's past speech that was investigated was unprotected, Canon 3A(6)'s proscription extends far beyond mention of Alabama court proceedings. A considerable portion of its potential applications appears to be unconstitutional. Accordingly, Justice Parker has shown a substantial likelihood of success on the merits in his constitutional challenge to Canon 3A(6).[14]

### 2. *Irreparable Injury*

An injury is irreparable "if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). The Eleventh Circuit

---

[14] Because Justice Parker has shown that Canon 3A(6) likely fails strict scrutiny because of its overinclusive reach and substantial overbreadth, the court need not address his separate argument that the Canon also constitutes an unlawful prior restraint. (Doc. # 83, at 18–20.)

has "repeatedly held that harms to speech rights[,] for even minimal periods of time, unquestionably constitute[] irreparable injury supporting preliminary relief." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (second alteration in original) (internal quotation marks and citations omitted).

The Commission contends that Justice Parker's speech is not being harmed because (1) the JIC dropped its investigation of the October 6, 2015 radio interview and no other investigations appear on the horizon, (2) that previous investigation was about Justice Parker's comments about a then-pending case before the court on which Justice Parker served (and thus—though the JIC does not complete the thought—may fall within the legitimate sweep of the Canon) and is unlikely to recur, and (3) Justice Parker's speech has not been chilled in practice, as evinced by the fact that he continues to give provocative talks similar to the one that initially got him in trouble. (Doc. # 92, at 53–57.)

It is true that attached to the Supreme Court's rule—that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"—is the premise that First Amendment freedoms are actually being diminished. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (explaining that a preliminary injunction was appropriate because First Amendment harm "was both threatened and occurring at the time"). But this requirement does not mean that Justice Parker must show that the Commissioners

are pounding at his chambers' door, that punishment by the JIC is imminent, or even that he is currently under investigation—as might be necessary if he complained of violations outside the First Amendment context. *Cf. Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (explaining that injury warranting a preliminary injunction "must be 'neither remote nor speculative, but actual and imminent'" (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989))). Rather, in the First Amendment world, the chill to speech is *itself* the harm, and that harm, "because of [its] intangible nature, c[an]not be compensated for by monetary damages," and therefore must be enjoined from occurring. *Id.*

The question, then, is whether Canon 3A(6) chills speech. On the one hand, Justice Parker is rather vague in his affidavit about what kind of speech he would like to give but thinks Canon 3A(6) proscribes. He notes only that he "frequently discuss[es] matters of public concern in public meetings, speeches, and media interviews, and [he] would like to be able to engage in the discussion of the important matters related to these issues." (Doc. # 83-1, at 3.) And, as detailed above, the examples his briefing does give—"political, judicial and constitutional theory, structures of government and its different branches, key public issues such as the role of the judiciary, constitutional interpretation, and marriage, and important legal history" (Doc. # 83, at 8)—have little or nothing to do with the

actual proscription of the Canon. Nor, as the JIC points out, did many of the allegations brought in the previous investigation, and those that did—concerning Justice Parker's comments about the *API* case then pending before the Alabama Supreme Court—may fall on the constitutional side of the Canon anyway.

But these particularities do not negate the fact that (1) Canon 3A(6) likely violates the First Amendment, (2) Justice Parker and all other judges and judicial candidates in Alabama are subject to a canon that is overbroad and appears to unlawfully proscribe certain categories of speech, and (3) this application necessarily chills, or threatens to chill, rights protected by the First Amendment. At a minimum, it gives the regulator indeterminate ammunition to attack a judicial candidate over speech on *issues* (as opposed to speech purely concerning *proceedings*). Perhaps this seems like a low bar, but it is one in keeping with the "stringent protection of First Amendment rights." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). "[I]f these rights are not jealousy safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Id.* Such a concern, after all, is the primary reason the Supreme Court has recognized a departure from traditional rules of standing in the First Amendment overbreadth context. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

Moreover, despite what the ordinary meaning of the text may be, key to this dispute is the way the Commission interprets and applies the Canon in practice.

This is why the court has explained that "[w]hether Justice Parker's claims are construed as facial or as-applied challenges—and the court need not pigeonhole them at this point—some discovery regarding the prior actions of the JIC is appropriate." (Doc. # 90, at 2 (citations omitted).) It matters how the Commission interprets and applies the Canon, and whether it will "continue to enforce the Judicial Canons in a way that will chill speech in the future." (Doc. # 64, at 23.) For this inquiry, the court cannot simply rely on the Commission's assurance that "any subsequent investigation" is "distant and speculative." (Doc. # 92, at 55.) As the court previously noted, "JIC already has proven the threat of prosecution credible and, at any moment, may start another investigation against [Justice Parker]." (Doc. # 64, at 11.)[15] Justice Parker has shown a threat of irreparable harm.

### 3.   *Balance of Equities and the Public Interest*

"Two principles are in conflict and must, to the extent possible, be reconciled. Candidates for public office should be free to express their views on all matters of interest to the electorate. Judges should decide cases in accordance with law rather than with any express or implied commitments that they may have

---

[15]   The potential for a judicial candidate who is a sitting judge to be removed from office pending the outcome of a JIC proceeding—particularly during a campaign season, disadvantaging a sitting judge vis-à-vis a non-judge candidate—is also indicative of a *threat* of irreparable harm. *See* Ala. Const. art. VI, § 159 ("A judge shall be disqualified from acting as a judge, without loss of salary, while there is pending . . . a complaint against him filed by the judicial inquiry commission with the court of the judiciary.").

made to their campaign supporters or to others. . . . [O]nly a fanatic would suppose that one of the principles should give way completely to the other." *Buckley*, 997 F.2d at 227. Also added to this mix is the unquestioned right of voters to complete, unfettered (by the government anyway) information about the candidates they must vote on. *See White*, 536 U.S. at 783. Though these are the interests at stake in shaping a constitutional form of the judicial canons, "the [state] has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Indeed, "there can be no irreparable harm to [the state] when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties." *Id.* (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

With that said, it does not necessarily follow that the balance of equities tips wholly in favor of the complete relief Justice Parker seeks—"that Defendants be preliminarily enjoined from enforcing or applying Canon 3A(6) of the Alabama Canons of Judicial Ethics to Justice Parker's protected speech and conduct under the First Amendment." (Doc. # 82, at 1.) The purpose of a preliminary injunction "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) (citation omitted). And

because an injunction is a form of equitable relief, "a court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" *Id.* (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2947 (3d ed. 2013)); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) ("[A] preliminary injunction must be 'narrowly tailored to fit specific legal violations . . . .'" (quoting *Start Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999))); *Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F. Supp. 3d 1253, 1262 (N.D. Fla. 2016) (explaining that granting a preliminary injunction "is not an all-or-nothing affair, and even upon a finding of substantial likelihood of success on the merits this [c]ourt has significant discretion to tailor relief so as to best serve the interests of the parties and the public").

For purposes of crafting equitable relief at this stage in the litigation, Justice Parker's proposed injunction is both overbroad and underinclusive. It is overbroad because Justice Parker has not shown (and is therefore unlikely to succeed on a claim) that Canon 3A(6) is unconstitutional in every application. Rather, he has shown a likelihood that Canon 3A(6) is overbroad when it touches speech about *issues*, particularly when such speech concerns pending or impending proceedings outside the Alabama system, or where the comments could have no impact on the outcome or fairness of a proceeding. Though a slimmer version of the Canon will

remain once the fat is trimmed, the Commission is entirely right that a broad injunction enjoining the total enforcement of Canon 3A(6) would not serve the state's compelling interest in preserving the integrity of its judicial system. (Doc. # 92, at 58 ("With the broad injunction sought here by Justice Parker, one which would eliminate any enforcement mechanism to deter judges or judicial candidates from speaking about pending or impending matters, Alabama's judges or judicial candidates would technically be free to comment publicly about any case, including how they would rule on its merits—during an election season.").)

The proposed relief is underinclusive because it seeks to enjoin Defendants from applying Canon 3A(6) only to Justice Parker. But if the Canon is so problematic because of its overreach, then it is infringing not just on Justice Parker's speech but also on that of his colleagues and other judicial candidates. Indeed, such a recognition of third-party harm is implicit in any overbreadth challenge, where "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech *of others* may be muted." *Broadrick*, 413 U.S. 601 at 612 (emphasis added); *see also Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1021 (7th Cir. 2002) (explaining that courts may also consider "the interest of and harm to nonparties from a denial or grant" of a preliminary injunction). Besides, it would make little sense to advantage Justice Parker by saying that he can speak about impending proceedings

with impunity but that his political opponents remain under the gag order of Canon 3A(6).

"Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006) (holding in challenge to partial-birth abortion law that because "[o]nly a few applications of New Hampshire's parental notification statute would present a constitutional problem . . . the lower courts can issue a declaratory judgment and an injunction prohibiting the statute's unconstitutional application" rather than "invalidat[ing] the law wholesale"). Such equitable limiting is especially appropriate when a law may be narrowed to its constitutional reach "but otherwise left intact," *id.* at 329 (citation omitted); when doing so is a "relatively simple matter," *id.* (citation omitted); and when the legislator of the law would prefer a limited version of the statute to none at all, *id.* at 330. Such is the situation here.[16]

---

[16] Though federal courts generally lack the "power to construe and narrow state laws," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (citing *United States v. 37 Photographs*, 402 U.S. 363, 369 (1971)), unless such a narrowing construction is "reasonable and readily apparent," *Boos v. Barry*, 485 U.S. 312, 330 (1988), these concerns hold less sway when a court is crafting equitable relief. That is, there is a difference between a court "construing" Canon 3A(6) to apply only to speech regarding certain pending or impending cases within Alabama—a construction that would have no binding effect on another court—and a court enjoining enforcement of Canon 3A(6) except under specific circumstances. The former constitutes an illegitimate—or at least ineffective—act of construction, while the latter falls within the equitable powers of the court. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944))); *Inland Steel Co. v.*

Key to this analysis is that Justice Parker seeks the preliminary injunction in the midst of an election cycle. Any relief will necessarily affect not just Justice Parker but also his opponents and every other judge.[17] The court must consider the harm to them, the voting public, and the state if the court were to (a) allow Canon 3A(6) to remain in place as is, (b) enjoin its enforcement completely, or (c) find a middle position pending outcome of these proceedings.

Having considered these three possibilities, the court concludes that the balance of the equities favors granting the injunction, but with modifications so that it will be tailored to better address the probable constitutional infirmities pending trial. As detailed below, Defendants will be able to enforce Canon 3A(6) against any judge who publicly comments about a pending or impending proceeding in Alabama, but will be enjoined from applying the prohibition to speech regarding proceedings in courts outside of Alabama *and* will be enjoined from enforcing the Canon if the judge's public comment cannot reasonably be expected to affect the outcome or impair the fairness of a proceeding in Alabama. In this way, the court enjoins "only the unconstitutional applications of the [Canon]

_United States_, 306 U.S. 153, 157 (1939) ("[I]t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect.").

[17]  As noted earlier, Canon 3A(6) governs only sitting judges. Though a non-judge candidate is bound by Alabama Rule of Professional Conduct 8.2(b) to follow Canon 3A(6), the enforcement of that rule falls to the Alabama State Bar, which is not a party to this case. *See* Ala. R. Disciplinary P. 2. The posture of the case dictates that the injunction will therefore affect only judicial candidates who are sitting judges.

while leaving other applications in force." *Id.* at 329 (citing *United States v. Raines*, 362 U.S. 17, 20–22 (1960)). Doing so will also hew closer to the status quo than complete abridgment would, and will protect, to the greatest extent possible, speech about *issues* that does not involve the merits of specific proceedings.

**4.   *Bond***

Federal Rule of Civil Procedure 65(c) provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978).[18] Here, no bond is requested, and there is no evidence that any party will suffer damages from the issuance of an injunction. Accordingly, no bond will be required.

**5.   *Hearing***

Though Federal Rule of Civil Procedure 65(a)(2) speaks about "the hearing" on a motion for a preliminary injunction, the Eleventh Circuit has made clear that

---

[18]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

"[a]n evidentiary hearing is required for entry of a preliminary injunction only 'where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue.'" *Cumulus Media*, 304 F.3d at 1178 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998)). No party has requested a hearing, and, at least for purposes of Justice Parker's motion for a preliminary injunction, the early facts remain largely undisputed and the contentions almost entirely legal in nature. No hearing will be held.

## B.  <u>Summary Judgment</u>

The JIC moves for partial summary judgment as to the constitutionality of Canon 3A(6).  (Doc. # 92, at ii.)  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Given that Justice Parker has shown that he is likely to prevail on the merits of his constitutional challenge to Canon 3A(6) and is due a preliminary injunction, summary judgment declaring the Canon constitutional would be inappropriate.  Nor would summary judgment in the other direction be proper, as it is "generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 452 U.S. 390, 395 (1981).  Justice Parker has also submitted a Rule 56(d) declaration purporting to show that he "cannot present facts essential to justify [his] opposition" at this time.  Fed. R. Civ. P.

56(d); (Doc. # 100-1).  The court has already denied Defendants' blanket objection to discovery, concluding that "[w]hether Justice Parker's claims are construed as facial or as-applied challenges . . . some discovery regarding the prior actions of the JIC is appropriate."  (Doc. # 90, at 2.)  For all these reasons, the JIC's motion for partial summary judgment is due to be denied.[19]

Factual development, appropriate briefing, and a trial and final judgment will ensure that all involved are adequately informed and that the compelling interests of the state, the candidates, and the voting public have been reconciled. Until that process is concluded, this injunction governs.

## IV.  CONCLUSION

It is ORDERED that Justice Parker's Motion for a Preliminary Injunction (Doc. # 82) is GRANTED in part and DENIED in part, that the JIC's Motion for Partial Summary Judgment (Doc. # 92) is DENIED, and that the JIC's request for an immediate trial on the merits (Doc. # 92, at ii n.2) is construed as a motion and DENIED.

Pursuant to Federal Rule of Civil Procedure 65(d), it is further ORDERED that Defendants are ENJOINED from enforcing Alabama Canon of Judicial Ethics 3A(6) to the extent that it proscribes public comment by a judge about a pending or

---

[19]  Likewise, the JIC's request that "this [c]ourt advance Justice Parker's Motion [for a Preliminary Injunction] to an immediate trial on the merits of his First Amendment claims" under Federal Rule of Civil Procedure 65(a)(2) will be construed as a motion and denied. (Doc. # 92, at ii n.2.)  The parties are entitled to discovery before proceeding to trial.

impending proceeding in a court outside the state of Alabama, and Defendants are ENJOINED from enforcing the Canon to the extent that it proscribes public comment by a judge that cannot reasonably be expected to affect the outcome or impair the fairness of a proceeding in Alabama.

DONE this 2nd day of March, 2018.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE